Good morning, ladies and gentlemen. This is the time for hearing on Bank in the United States, case of the United States of America v. Aukai. And we understand the counsel are ready to proceed. Judge Gould is not able to participate with us this morning. We will review the tapes of argument and participate in the decision. And so we will proceed to hear the oral argument. And the counsel for the appellant may proceed. Good morning, Your Honors. May it please the Court, Pamela O'Leary Tower on behalf of Daniel Kuu'aloa Aukai. We're here to revisit the airport search of my client that was conducted in February of 2003 when he asked to leave the airport. And our position has been since that time that the search was illegal because Mr. Aukai elected not to fly. And under United States v. Davis and this circuit's progeny, he should have been permitted to leave, but he was not. And it's our position that when analyzed under consent or special needs or the administrative search doctrine, which is how Davis analyzed these types of cases and most recently the Marquez court, that the search that occurred here did not serve any of those purposes such as they are, and therefore was conducted without probable cause or reasonable suspicion or any kind of individualized suspicion necessary to sustain its legality. Counsel, could you help me on my analysis of whether it's really consent or special needs? It looks to me as though it's special needs. The idea is to keep the airport free of guns and explosives on the far side of the security line. And it really doesn't matter if an individual decides he'd rather not fly. Once he's on the other side of the magnetometer, he could bring something, he could have something in, leave it there for somebody else to pick up. Why isn't it part of the special needs of the government to preserve safety in flying that they'd be able to check him out once he's on the other side of that magnetometer? Well, assuming for the sake of argument that this court decides that these types of searches are now going to be analyzed under the special needs doctrine, which doesn't appear to differ significantly from the administrative search doctrine utilized by the Davis court, the special needs, such as it is, and it is a valid need and we don't dispute that, is the safety of passengers on planes. And that's also dictated, Your Honor, by the statutes that control airport searches and by the regulations as well. I agree with you, but what I'm thinking is you just do a lateral pass. You bring the explosives in but don't get on the airplane and leave them for somebody else to pick up. Well, that's a possibility, but we don't have any real evidence. Yes, we do in the record. There's a description of, in Honolulu International Airport, what you have is what we call a sterile area in between the magnetometer and when you are finally released to go out into the main boarding areas of the airport. That's considered the sterile area. So between the magnetometer and when you collect all of your items, assuming you're not selected for secondary screening, you are within an area that's protected and surrounded by law enforcement and things of that nature. I suppose that it could happen. It's not what the special need is for. If Congress wants to pass legislation that deals with deterring or detecting these types of situations, then it can do that. Our position is that Congress hasn't done that yet, and when Mr. Alki elected not to board a plane, in the absence, in our case, of any individualized suspicion, he should have been permitted to leave. At what point did he actually make that decision? Our position is that he made that decision prior to being wanted, prior to the beginning of any secondary search, but after the primary screening. Yes, Your Honor. Does it make a difference if that is considered one entire search or two separate searches, in your mind? Yes, it does, Your Honor. We consider it to be separate searches because that sort of ties right into the issue of consent, if it's still a viable issue in terms of analyzing these types of cases. Why shouldn't we treat airport searches like sobriety checkpoints, as in the Michigan case? A sobriety checkpoint like Michigan's, you drive up and you're stopped, and it's a visual search. Assuming you didn't run over barriers or police officers or hit another car, it's a visual search. Well, it's also a smell search, isn't it? Over here. I'm sorry. It's also a smell search, isn't it? Yes, Your Honor, it is. But it's far less the police officer is standing away from the individual who is in his vehicle, as I understand it. At that point, if there is an odor of alcohol, bloodshot eyes, slurring, or some other evidence like swerving prior to the person coming to a stop, then they can have that person perform field sobriety tests and or if they refuse, arrest them for it. Well, to answer Judge Hawkins' question, isn't your answer that you have to drive away from a sobriety checkpoint? So if they see you – I mean, there's no way to walk away from a sobriety checkpoint. No, you cannot. So whatever the danger is they're trying to achieve, prevent with having a checkpoint can't be prevented by saying, look, I'm going to turn around and drive away the other way because it doesn't matter where you're going, you're trying to avoid drunk driving. They're still on the road and they're still drunk. That's correct. So that's a distinction at least. Yes, Your Honor. And I think it's a pretty strong distinction. In our case, or cases like airport search cases, the whole idea of airport screening, primary screening, secondary screening. Let me ask test your proposition. I mean, your view is you walk in, nothing happens, and you decide there's no alarm that goes off or anything else, and you decide to abort the flight, and at that point they should let you go. What if you set off the alarm and you say, okay, in that case I'm not going to abort the flight. You're still not endangering the airline, right? Because you're offering to walk away with your gun or your bomb or whatever it is that you have. Does the same analysis hold? Yes. Well, isn't there a point? I'm not sure. I know, Your Honor, but the theory is that even if you, and there's, I think, if you alarm, there should be layers of search. In other words, you can't just search someone wholesale. Even if they alarm, there's case law and other circuits that say, then you get to peel back the layers of the onion to find the metal object. So when the person removes the metal object, you want them again, and they don't alarm. You can't go any further. So there's circuits out there that say that. And in the sense of, I'm not saying they should walk away scot-free. What I'm saying is that in terms of the permissible scope of a search for airport screening purposes, if they alarm and say, you know, I want to leave, you still have some kind of reasonable suspicion. You still might have Terry stop. You still might have some of that. That's where my question lies, and that is, what constitutes reasonable suspicion sufficient to go further? Because I understand your position to permit that. In other words, that if there is an individualized suspicion, it's kind of like a Terry stop layered onto the screening process. And the question then, for me at least, in part, is, is a person's desire to abort the flight itself a source of reasonable suspicion that there's something there to hide? Or is it simply the exercise of a right? That's what I'm trying to struggle with. I think that if we look with Judge Kaczynski's hypothetical, that if you alarm and then ask to leave, it's not unreasonable to either follow you or note on your boarding pass, take some kind of affirmative action to determine what this person is about. That would be somewhat suspicious. If you have nothing other than a request to leave, under United States v. Fuentes, that cannot be considered suspicious in and of itself. My question really goes to ‑‑ I'm over here. Hi. It plays somewhat off of Judge Bordlaw and what is the search. As I understand your description and looking at the record, you have the initial entry point where the magnetometer is, and then there's a space which I think you referred to as the clean or sterile area, and then you can exit. Why wouldn't it be reasonable to construe that entire area as part of a single search? In other words, that is the contained area. And it might be a different question if you leave that area, as some of the cases have situations. But why isn't it really part of a continuous search within that contained area? Because, first of all, not everybody is selected for secondary screening within that contained area. Some people just walk right through. And there's many different permutations of that search, if we consider it as beginning at the magnetometer and continuing through the sterile area. Any number of things can happen. But doesn't it all go ‑‑ it really is a single search process, isn't it? It can end, for some people, begin and end at the magnetometer. It can, for some people, if they put their luggage through the X‑ray and it has an inconclusive scan or a conclusive scan, it continues. But that's really no answer to the question. That just says that different people, depending on the circumstances, are subject to different aspects of the search. Isn't it true that within that little area, you're basically subject to the control of the officers within the contained area, correct? You are subject to the control. So if we take your point, would we have to analyze every little thing as a search? In other words, some places don't even make you take off your shoes. So let's say you go through and now you want to take off your shoes. Is that a new search? No, take off your jacket. That's a search. Go to secondary screening. Let me look at your luggage. You would have each one of ‑‑ you would have us analyze each one of these as an independent search. Is that your position? Well, my position is, is that at any point during this screening process, which begins with the magnetometer and continues to release into the general boarding area, which I concede is a hard sell, a passenger, a potential passenger who has ‑‑ may change his or her mind. And I think that we need to look at the layers of intrusion, even if it's one search. But in order to take that position, each one of these is a ‑‑ each little aspect is a search. It's not part of a continuum, in your view. My view is that they are separate. And actually, the case law talks about the magnetometer as the primary. Then there is any possible permutation of secondary screening. Secondary screening can range from wanding around the outside of a person's body to pat down to even further intrusions, which I have not yet found in any of our airports. Mr. Alki was put ‑‑ excuse me. Mr. Alki was directed over to a screened area and told to wait. And then at some point he said, I want to go. How long was he detained from the period where he was directed over to the screened area to where he left? And how long was he detained from the point where he said he wanted to go? Do you know the time frame? I don't know the ‑‑ Was it a few seconds? Was it a few minutes? No, it was more than five minutes. The record is not clear on that, is it? It's not really clear. There is a boarding pass that says that the flight leaves at 9.05, and I think it's fair to assume that the flight left at 9.05. There is testimony from the very first TSA officer that she recalls seeing that boarding pass and the person coming through, and in her report she wrote 9 o'clock. So I have a five‑minute window right there in terms of he sent over, according to her testimony, he says, I'm in a rush, my plane is leaving. She sends him to secondary because he has no ID. Right, and that's my question over here. No one has talked about in this case the fact that he didn't have a photo ID, and that was stamped on his thing and his boarding pass, and what that meant was no matter what happened at the magnetometer, he was going to have a secondary search under the TSA policies. So why doesn't that further justify this as a special needs search? I mean, after all, in this day and age, when people are flying, everybody has to have a photo ID. In fact, I'm surprised they would even let him get on the plane without a photo ID at this point. Well, actually, you don't have to have a photo ID to fly. Well, but if you don't have ‑‑ It's easier if you do. Yeah. But if you don't have a photo ID ‑‑ You will be automatically ‑‑ At the secondary search. And that's because the photo ID either creates some sort of level of additional level of suspicion, the fact that you don't have one, or puts you into a higher category of risk that the airport ‑‑ that would justify the secondary search. I think that ‑‑ I understand your question. However, in light of the fact that TSA does, in fact, permit people to fly without photo IDs, as long as they're willing to undergo the secondary search, they, the government's agency, has made a determination that a secondary search will satisfy any concerns they might have. Right. But your client refused to do that. And so, I mean, what you're saying at one breath is that he could fly without a photo ID as long as he went through secondary, but your client refused to go through secondary. My client elected not to board. I don't dispute the right of TSA to search people if they do not have a photo ID. I absolutely support it. What I'm saying is that all of these rules, regulations, and statutes are forward looking. They go towards boarding aircraft. Let me ask you this, if I can. You framed your argument so far in terms of the legitimacy of TSA preventing danger once someone is aboard the aircraft. Do they also have a legitimate justification for their administrative or special needs searches to protect people within the airport? Statutorily, no. What do you mean statutorily? The statute says they have the right only to protect with respect to people on board an aircraft. What the statute says is that you may not, and I'm paraphrasing, but you may not board a plane if you do not consent to various types of searches that may make. I think what the statute says is that an airline may not let you on board. That's correct. The punishment is not directed to people. The punishment is directed to an airline that permits you to board. That's absolutely correct. I think Judge Fletcher's question is a different question, which is once you've crossed the threshold, submitted to the first part of the you've divided these into two searches, submitted to the first part of the search, doesn't the government have an interest in making sure that you don't get back into the terminal once you have sort of triggered their additional level of scrutiny? I note that in the Homburg case, we took, we had a series of footnotes noting bombings and other attacks in airports that may or may not have been in the passenger only sections of the airport. So isn't there a secondary reason here for not wanting to let somebody back into the terminal? Well, I think that that, yes, and that's absolutely correct, because from the time, in Davis's time, 35 years ago or so, when we were developing this case law and statutes on anti-hijacking, they did talk in terms of airport bombings, and there were airport bombings. And, in fact, in Hawaii twice now, we've had people ram into our, try to drive into airports and succeed. So, yes, that's a valid concern, but that is what our position is, that's a general law enforcement concern. I have a question when you're done. I have a question when you're done. There's a practical component to all of this besides the legal component. Obviously, people have to know what's going to happen to them as they cross the threshold, and also TSA people have to know what they can and cannot do, you know, what are the rules, and then we have our cases. Now, if we just assume for a moment that crossing that threshold, if it's, you know, where you go in, whether it's the magna, whatever you call it, the magnetometer, the magnimeter, or whatever, that once you cross that, if that were the point that you were consenting to that search and any secondary searches, and that you don't have a right to turn around, all right, if that were to be the holding, that that's what it is, we're sitting on bonk, so that means that we can revisit any of our own precedent, but obviously we're still bound by Supreme Court precedent. If we overruled Homburg and we overruled Minor, what are the other legal impediments from making that a security checkpoint, and once you cross over, it's going to be for that screening and any secondary screening, and you can't turn around? Notice. Notice, Your Honor. Well, tell me what cases say you can't do that. Well, I know the cases. I don't have one at my fingertips, but the cases say that the notice, if I am going to be subjected to an unrestricted search of my person and my things, just because I walk through the magnetometer but then decide I don't want to fly, I'm entitled to notice of at least what I'm going to be facing by making that choice. Counsel, on that point, does the record show whether there was a sign that said all passengers are subject to search? Yes, Your Honor. The government introduced, I think, two or three exhibits that were your basic requirements. The first one was that there was a sign that said all passengers are subject to search. What does that mean in your term? To me, it means I have a right to walk away if I change my mind. Counsel. It doesn't mean I get searched if I'm not getting on a plane. If I'm getting on a plane, then I'm going to be searched. He changed his mind after he had passed the sign, right? Yes. Counsel, National Treasury v. Rob says that in a special needs search, the lack of individualized suspicion actually helps in that case because no one is being singled out. And it says that what we're supposed to do is balance the individual's privacy expectations against the government's interest to determine whether it's impractical to require a warrant or individualized suspicion. What I'm thinking is when you consider the individual's interest in privacy, it's helpful for him to have a clear line like the magnetometer. People approaching a magnetometer typically check their pockets, see if they left their keys or their cell phone in their pocket by accident because they don't want the bother of getting beefed in sense of secondary. If somebody discovers he accidentally left his gun in his pocket, they'll say, oh, I've got to run back out to the car, stick it in the trunk. It seems like that's helpful both for the individual's privacy because he has a real clear line and also for airline security because it prevents tricks like just leaving a plastic bag with the ammo or some other component on the chair in the security area and then having the individual leave and a confederate pick it up. It seems like it's just real simple to administer. It helps the individual make his privacy decision at a time when he knows this is the time, and it protects the airline from tricky ways as well as direct ways of getting weapons on airplanes. I don't understand really what the problem is with making the magnetometer the bright line. I don't think there's a problem. I agree that TSA needs guidelines and that passengers need guidelines and the marshals and the police officers that are inside the airports need guidelines. Those weren't present in this case. So what we're talking about is a due process requirement here at a minimum that I know what's going to happen when I walk through that magnetometer. And randomness. What if the guy is already at the gate? He's gotten all through the security. He's sitting at the gate, and TSA gets a tip. So they go up and say, we want to talk to you some more. We've got this tip. And he says, well, I don't feel like talking to you. I changed my mind. I'm not going to fly at all. They have a tip. It may amount to Terry stopped tip or some kind of suspicion, which would then shift the analysis. I think what is helpful, at least for me in trying to address the court's concerns, is to look at this as it began as an airport screening search. But at some point in any of these cases, Minor, Moore, Homburg, Hartwell, any of these other cases, what happened was, with the exception of Torbert, some form of suspicion arose. Something happened in those cases, factually, that could qualify as a form of suspicion, sufficient to detain perhaps for a little while, sufficient to arrest in the case of Homburg, sufficient to follow them out to the curb. Well, trying to board the plane without I.D. is one such event. I mean, you know, it's unusual. It's, you know, why, if you were going to classify things that way, your client falls on the wrong side of the line. He tried to do something, you know. He not only tries to rush into a plane at the last minute. I gather he bought his air ticket right there at the airport. He's an employee of the airline, Your Honor, so he just wrote his own ticket. I see. Okay, well, but he tries to board without a, you know, there you got it. Well, I think that it's fair to assume that people frequently forget their identification, that we can fly without identification. It happens, but it is unusual, and it is also indicative of possible nefarious activity. I mean, there are lots of things that you do that could be accidental or innocent, but that are also used by, also happen because people have nefarious motives. So if you're looking for some sort of reasonable differentiation between the people who have sort of for a good reason and, you know, you're sort of listing cases, your case falls on the wrong side of the line. But, Your Honor. Because your client, this was not one of the situations where he had everything and they just randomly picked him out for secondary, which I guess sometimes happens. This guy was picked out for secondary because he did something very unusual, tried to get on a plane without ID. As would anybody else who didn't have ID. Therefore, any uniqueness to him is... You know, I've been in those lines a zillion times, and I've never seen anyone without ID. I'm really, it may be common, but it's not common in any flights I've ever been on. If I might offer anecdotal, I had two clients who were arrested and convicted and detained at OCCC in Hawaii, and their IDs were removed and lost by the State, and they both flew back to the United States without identification. I'm not disputing that it happens. I'm just saying it's unusual enough that I would venture to say a few of us in this courtroom have seen it. I've never seen it. And it strikes me as a kind of event where they have a good reason for taking a closer look. Absolutely. I'm not saying they don't have a good reason. What I'm saying is that the reason to take a closer look evaporates when the person decides to leave and has not otherwise alarmed or triggered or in any way... And that hint is an answer you gave me a few minutes ago when you said even if he alarms, he gets to walk away. That would be... He knows that I had, you know, they've got a little thing that they want, your luggage, and it says this guy's handled dynamite or whatever it is they put in, bullets, and comes up positive. You get to leave. You get to take your possessions and go home. You don't get to go home. The search for purposes of airport screening, if you elect not to board, stops being a screening administrative or special needs search because you're not going to board, and it then becomes a legitimate search or detention based on probable causes. There's nothing illegal about pressing your own bullets. You can, you know, I do it on occasion. There's nothing wrong with that. There's nothing illegal about having gunpowder residue on your hands, or not gunpowder, whatever they put in, you know, the stuff they put in bullets. That should be fine. You might have been out hunting, or you might have been sort of just had one of your visits to the gun club to keep them, and, you know, there's nothing wrong with that. They couldn't possibly arrest you because you have gunpowder residue on your hands. No, but it could permit them to... Follow you for the rest of your life? No, inquire, notate your boarding pass, make some kind of indication. But you're leaving. You're saying, look, I'm no longer a passenger. You can keep the boarding pass. I am going home. I'm taking my satchel, the one that had the gunpowder residue on it, I'm picking it up, and I am taking it home. Goodbye. You have only about a minute left. Thank you, Your Honor. I forgot to reserve at the beginning. If you wish to reserve some time. I would. Your Honor, to answer your question and go out on a limb here, I believe that once you decide not to board, you should be permitted to leave. Thereafter, normal law enforcement investigative techniques can kick in and protect the people that need to be protected from that type of activity. Thank you. Good morning, Your Honors. John Drennan for the government. I have Sue Chicanowitz of the Transportation Safety Administration with me at counsel table. Could you – the acoustics here are not perfect, so if you could speak slowly. Thank you. This was a special needs search. In particular, the special needs were the safety needs of commercial air travelers. And that's what justified the secondary screening of Akai. Consent was relevant, but only as a threshold matter. It wasn't relevant at the moment that the search was undertaken. Consent is relevant in the way that Biswell makes consent relevant. Consent frames the expectation of privacy. Just as in Biswell, the – No, it doesn't help. It doesn't help here as a problem because the argument on the side is when you call it consent of special need, it stops once he says, I'm going home. There's a special need to keep people from boarding planes who are a security risk, but at the point the guy says, never mind, I'm going home, the need stops. We disagree with that, Your Honor. We believe that layered security is appropriate. In this case, we're assuming that a terrorist may be able to beat the initial magnetometer, and there will be a need for secondary screening in that case. For instance, the bomb they bring on board hypothetically might have a low Ferris content. That could be picked up either by the hand screening device, which is more sensitive, or more likely by – But that's not responsive to the question because you're saying they need to screen some more in order to keep him off the aircraft. But the hypothetical is he says, I'm going home. I'm not getting on the aircraft. So I think your answer has to be, if you're still going to justify it based on special needs rather than some individualized suspicion based on his behavior in refusing and so on, is that the special needs has to include not merely safety aboard the aircraft, but safety within the airport. Your Honor, we do believe that there is authority – that TSA has authority over the airport for safety. But ours is a deterrence rationale. It follows on what I was saying to Judge Kaczynski. We – a terrorist doesn't know that they're going to be selected for secondary inspection, but they do know that they could be selected for secondary inspection and the destructive device found. So it's not – If we followed – excuse me. I'm over here. I'm sorry. If we followed your rationale all the way where it seems to lead, though, that would mean that someone couldn't even turn around before they get through the screening. Because once they're in the airport and they're able to look at the screening process and observe and have all these bad purposes for doing that, under your rationale, anyone who just walks into the airport and looks around would be subject to a search or screening of some sort. Your Honor, we think the reasoning of the Supreme Court in Martinez-Fuerte is applicable here. We have a visible checkpoint, a sort of drop-dead space where you don't go behind without being searched. You come up to that space and you see that people are taking off their shoes and jackets and whatnot and going through searches. So we think there's a visible difference between a fixed checkpoint, which is obviously being run in a routine fashion, and just walking into an airport. Where is the – I'm here. Where is the line beyond which the search has begun and you cannot withdraw? Is it the point you've gone through the magnetometer, so that if you're taking off your shoes and taking off your jacket and starting to put them on the belt and all of a sudden you say, I don't want to do this, that you can pick up your shoes and pick them off the belt and walk away? Your Honor, there are two different answers to that question. One is constitutional and one is about TSA regulations. With respect to TSA regulations, it follows this Court's rule in Pulido for carry-on items. When your bag, carry-on bag, touches the conveyor belt that goes to the X-ray machine, that's the drop-dead point. And when you go through the magnetometer, although Pulido doesn't say this for the obvious analogy, is when you go through the magnetometer, that's the drop-dead point because you've entered the checkpoint. Constitutionally, we think when you presented yourself for screening at the checkpoint, the visible checkpoint, that's the drop-dead point. Is that the point at which you have the contract employees who are looking at your ID and your boarding pass to make sure that they match? No. Typically, those are contract employees who you meet somebody initially to make sure there's a matchup. That's typically an airline employee. It doesn't have to be. It can be contracted out. But that's almost never a TSA employee at that early point. The TSA employees or the people who have contracted with TSA to perform the screening duties are the ones with the uniforms on. They're readily visible and make themselves so. Counsel, must we overrule Davis for you to prevail? No, we don't think that you have to overrule Davis. We think that this case fits nicely into Davis. It's clear in the checkpoint scenario that one can turn around and go at any time. We'd also point out with respect to Minor and Homburg that you wouldn't have to overrule those cases. Times have moved on since the 1970s. Things have changed. We have 911. We realize now that we do need deterrence. We need deterrence, Judge Fletcher, because once you get on a plane, once a hijacker hijacks a plane, they have a weapon of mass destruction. It's not just a relatively enclosed space where it's relatively easy to kill your hostages. Counsel, what about the language in Davis that says that a person can elect not to board in lieu of a search? We believe that a person can elect not to board in lieu of the search. We just think that there's at the checkpoint where it's visible and clear that you are going to be searched. There's just no question that any rational human being would not know that. Is it an unlimited right to search? Let's take a scenario where someone is ‑‑ there's no individual suspicion, but there's selected as the 119th passenger, every 119th person is randomly selected. So someone is selected, and let's say at your airport they're testing the device that can see not only your underwear, but everything else, and they want you to go into that. And someone says, hey, you know what, visiting my aunt is not that important to me. This is humiliating, and I'm going to leave. Is the consent irrevocable when there is ‑‑ when it's beyond that initial, what one would expect to be normal primary screening, and there is no individualized suspicion of any kind? Is it irrevocable? We believe that it is irrevocable, but what it does, consent in that case sort of forms the basis for your expectation of privacy, and you might have a greater expectation of privacy in your underwear than you do in, say, a hand wand going around your body and a quick pat down with the back of your hand if it's below the belt. So in my hypothetical, that person would not be able to say, I'm just going to leave. I'm not willing to have this intrusiveness, and I've given you no reason to suspect me in any way. I just want to go home. If I understand the hypothetical, there may be searches that were so intrusive that a different type of Fourth Amendment balancing, or the same type of Fourth Amendment balancing, but a different Fourth Amendment balance would be struck. And consent might make a ‑‑ revocation of consent might make a difference at that point because it shows that there's no expectation of privacy or no expectation that one's privacy would be that far violated. We could understand that. But here ‑‑ When does the search end? There's been some discussion earlier with opposing counsel that whether there's one search, two searches, multiple searches, presumably even you think that at some point it ends and that any additional future search would have to have a separate justification. When does it end? We see this process as just one uniform process that goes through with several different layered steps. It's a wham. It's a wham. It would end at the ‑‑ typically at the end of the secondary, which would normally take less than three minutes to complete. It can escalate, as this case shows. It can go on and become a clearly criminal matter. There are times when the search could go on. But let's let ‑‑ you have to ‑‑ the question is physically does it end when you leave that contained secure area? Your Honor, there's some confusion as to that. The sterile area is everything behind the checkpoint. And it goes right up to the airplanes. Okay. So my question is, is it your position that it's a continuous ‑‑ you're in a continuous search risk from the sign that says search all the way until you board the airplane? Or does this initial search have some definite end before you get into the terminal and sit down with your bag? We think there is room for reasonable suspicion after you get past the checkpoint, where these types of searches are sort of advertised that they're going to be done. So, however, we believe that we have constitutional authority over everything. And a lower expectation of privacy is appropriate in the entire sterile area, much further toward the border. But today is your position that this is what we would call or what you've phrased the checkpoint area? The checkpoint area is what we take to be the visible notice that you're going to be searched. That's the point at which nobody could go in there without understanding there's a search in play. They may not be secondarily searched, but they sure know that they could be. Now, the Supreme Court cases on the checkpoint cases ‑‑ Yes, Your Honor. ‑‑permit 10 to 15‑second searches, detention for 10 to 15 seconds. And then says any further, any additional time for detention would require probable cause or an articulable reasonable suspicion. What's the Supreme Court case that would allow these extended detentions, such as Mr. Alki experienced, or what you're talking about, that from a point when you pass the magnetometer until, I guess, you board the plane, you're not free to leave. Can you tell me what the best Supreme Court cases are for that sort of detention? Yes, Your Honor. The recent gas tank case from the Supreme Court says that certainly an hour in detention would not seem unusual, and that could be done on a suspicionless basis. What we're talking here is minutes, much, much short of the time the Supreme Court envisioned in that case. The Supreme Court also pointed out in the footnote that I'm talking about that it's not clear and its jurisprudence didn't involve drop dead points in time. So they've certainly backed away from that. But they certainly allow that an hour or two would be fine. Here we're talking minutes. Do we need to get past the checkpoint issue to decide this case? We don't think you do need to get past the checkpoint issue. We just think the checkpoint issue plays into Sitz and Martinez. We think that there's a special need, and we think what we're asking Mr. Alki to complete is relatively little. It's just a bare minimum. You're talking a lot about things that I'm not asking about. And I want to focus. I'm thinking there can be serious issues past the checkpoint. A person's gotten through the checkpoint, he's clean, sits down at gate 23, he's waiting 40 minutes for them to allow him to board his plane. A TSA person says, excuse me, sir, somebody noticed that you picked up a gym bag in the men's room that you didn't bring into the men's room. Do you mind if we look in the gym bag? It strikes me that that's an interesting case, but it's not this case. We don't have to decide it. We believe that the Fourth Amendment jurisprudence wouldn't really allow us to decide that case here because we need to look at the specific circumstances of the cases in front of us, even on a programmatic basis. So we don't think that case is this case and, you know, might be for another day. We typically don't do suspicionless searches in the sterile area past the checkpoint, so it's not even clear that that case is going to come up. So we don't need to decide it. It really doesn't. The rule doesn't need to cover that. Now, let me ask you about something a little bit different. You let off your argument talking about consent, and I know a lot of the cases are worded in terms of implied consent. That's right. When I read national treasury versus FONRAB, I don't really see the role of consent there. There's the role of knowledge. Every treasury employee knows he's going to get a urine test before he gets a promotion to a gun position. Yes. But I don't see where consent or implied consent is a factor. It has always struck me as kind of artificial, living in Alaska, to say, well, you don't have to fly if you don't want to. Take the bus for a week and a half. Well, let me just start out backwards. ACAI isn't challenging the burden on his right to travel, and this case, this Court's recent case in Gilmore, would, I think, do away with any such argument. But consent at least makes the search less intrusive. Is consent an element in national treasury versus FONRAB or the other Supreme Court decisions on special needs searches? You're certainly right. It is not an element. And if you look in, say, Skinner, which is the railroad employee search cases, the Supreme Court simply assumes that employees would probably know the terms of their employment engagement. It doesn't require any facts about that. It just sort of says, well, undoubtedly, blah, blah, blah, blah. So the consent issue doesn't seem to be, certainly not what the Supreme Court is focusing on in FONRAB or Skinner or, frankly, any of these cases. In fact, consent is a construct. There's nothing requiring consent or requesting consent when you board a plane. It doesn't even formally say, by crossing this line, you're here by consent, as I recall. It is simply a fact that if you get in that line, you're subjecting yourself to a certain process. You may, in your mind, say, I disagree with this, I don't consent, I rebel, I think this is a tyranny. And it sort of is, you know. But it doesn't matter, right? Well, we'd say that consent helps form the application of premises. But there is no consent. There's not even the formal request. There's not even the formal consent that you give when you sign a traffic ticket where you say, I promise to appear in exchange for being released. This is an implied consent. It is not formal. It's not consent at all. It's not the normal consent, Your Honor. But it is notice. It is notice, but it's not the kind of consent where you're out on a highway and a trooper stops you and he says, can I look in the boot of your car? I don't see where it has anything to do with consent. I mean, if I want to go to Nome or Juneau, there's no road. There's no way to get there except to fly. One could certainly analyze this case without consent. I'm not sure I understood your answer to Judge Graber's question about these newfangled machines they have in Phoenix, for example, that X-ray, they have little blobs so that the people can't see your face, but they show your whole body. Now, if someone is going through and they say, oh, my gosh, I'm going to be subject to that, I don't want to do that. Is that person free to say, oh, I don't want to do that? In the present context, we don't think that person is free to say that. These blobs were considered in Kilo, and in Kilo, it's entirely clear that the Supreme Court was focused on the privacy expectation of one's home. And here you've gone to the extent of the privacy expectation in your body as well, isn't there? I don't say that it's unconstitutional. I don't understand how you're relying on that. Well, as a matter of fact, don't they let you have a choice? If you don't want to do that, they will wand you? Yes. You can have the option. You can opt out. You can say, look, I'd rather. I'm not opting to leave, but opt out and say, no, I would rather do the traditional wand. Well, what the opt here is that if you opt out of the magnetometer, that sort of thing, you probably will be wanted. You might be able to opt out even of the wanting, but you would be subject to a full path down search at that point. So it's not clear that you're opting out of being searched. We're talking about this newfangled X-ray machine, which there was an article about, and some of us have actually seen it, where they actually see parts of your body, nipples and all, that some people might feel uncomfortable with. But my understanding was if you choose not to walk into the booth to have that done to you, you could say, look, I would rather have a wand. I would rather stand there. And this is viewed as somewhat less intrusive because you don't have to have anybody touching your body. But if you choose to have a wand, that's your choice. I'm not familiar with the option for a wanding, and it may well be there are various pilot programs and standard operating procedures that are changed. But the practical matter, that may be. But your position as a legal matter is that that's not necessary. Right? Your Honor, that is our position. And so there's got to be some limit. It's still a reasonableness test, is it not? It is still a reasonableness test. They can't say, well, you know, it's a lot easier just to strip search everybody. Then we really know if they have anything. Would that be permissible? We do think we could search every single person. You think you could strip search every person? The body cavity search as well. I just want to make sure I understand your position. That would be overkill, and it would violate the Fourth Amendment. That might go a little far to strip search. Strip search would probably go a little far. And if there's an expectation of a strip search in body cavity, so we've got the notice that you're, by stepping through the magnetometer, you consent to that, or that's an expectation, does that alleviate the Fourth Amendment concerns? We don't think that we could just post that everybody might be shot if they go here. You go here, you know, lose all hope. So we don't think that that would be a real expectation of privacy, but we do think What's the principle line between the wanding and the strip search or the X-ray and the strip search? The strip search is much more invasive, and we'd have to take a much or this Court would have to take a much stricter look at that. Here we're asking for a relatively innocuous procedure, and the Court doesn't need to be as closely observant about innocuous procedures as it would for, say, strip searches in Judge McAllen's case. What strikes me as odd about this case is that clearly there are points at which a person can decide to leave. Before they get to the checkpoint, you've agreed that no matter how much surveillance they could be there for five hours looking everything over, but they can still leave without being searched. If they've gone through the checkpoint, they get to the boarding area, and they get an emergency call, you know, their kid is sick, they can leave without further search, even though, you know. So the only question, it seems to be focused on the primary versus secondary, whether that's a single search to which you've consented, period, or whether there is any break in the action where if there's no individualized suspicion aroused, whether you can at that point leave. And I still am not sure that I understand why it is that if you've passed successfully through Stage 1, and there's nothing about you that is suspicious whatsoever, you've just gone through and you're standing there and you decide, I know that I've been selected for random screening, but I need to leave, or I want to leave. What is the principle basis on which that permission is constitutionally denied? We believe that we have to deter terrorists, and layered screening allows us to do that. We believe that if you knew that, you could just test the initial magnetometer, perhaps even beat it, and then withdraw. Should you be subject to secondary search for whatever reason, that terrorists would simply come in, figure out where the initial magnetometer was set. But they can do that by watching, and they can do that by getting all the way through to the boarding area and then leaving without getting on an airplane as well. In much harder ways. But this would be a very simple way to do it. It would also encourage just checkpoint shopping. You couldn't do it in this checkpoint. You could just go down to the next one until you get it. You don't want to encourage people to test their luck against the system. Sotomayor, what's wrong with the suggestion opposing counsel makes that tying it to the exact facts of this case? Yes, Your Honor. He goes through the magnetometer. There's no alert. The reason he's chosen for secondary screening is no ID. Yes, Your Honor. They wand him down. There's one metal object. He pulls it out. It's not a problem. There's a bulge in his pocket. Every airport I've ever been in has police officers in it. What's wrong with turning him over to the police at that point and they can proceed from there? Well, in this case, it's not clear that they're going to be a passenger. Their interest in keeping him off the airplane is gone. Your Honor, we believe that the interest is not gone because we have this deterrent interest. We believe that at that point you can't just say there's no further interest in going ahead with the search. But that's an unlimited rationale. That rationale could let you do anything to anyone at any time anywhere. There's no limit. And in the circumstances, the court would have to examine whether that was appropriate. Isn't that just an interest in general crime control that Edmunds said was not appropriate for these suspicionless searches? Our screeners are not trained for crime control. They're not asked to do crime control. Congress has set up an entire agency, the TSA, Transportation Security Administration, to screen passengers. To protect passengers, right? This person is saying to go. This is a strong indication from Congress that, no, in fact, that's not what we're trying to do. And, again, the fact that they're not trained to do that and they're not asked to do that would surely suggest that Edmunds is not on point. Well, it's not just deterrence. Don't you want to also apprehend people who are trying to bring bombs and guns on planes? We do. And we think that's part of the deterrence. But, yes. You wouldn't let someone say, okay, it's my bomb. I'll take it home now. Right. If they came across, say, the x-ray machines and they said you have a bomb in there and I said, well, you caught me. I'm leaving. We wouldn't let them leave. We would call the police. But you wouldn't let them leave because having a bomb in public is a crime and they can stop him on suspicion of crime at that point. They are law enforcement officers to that extent. Oh, Your Honor, they are. Okay. Justice here says, you know, yes, you know, I've got two pounds of heroin in there and if you do nothing, we'll go home. They can hold him long enough for the police to arrive to pick up the heroin, right? TSA doesn't have an enforcement authority. They're not law enforcement officers. How did this guy get turned over? How did this guy? This guy got turned over because a police officer was standing there and he got called over because the supervisor thought that he had a knife. He was worried. He thought there was some danger to himself. But where in the record does he say about the knife? Because I understand that. I believe it's TR-48, Your Honor. TR-48. Where's that in the excerpts? I mean, our excerpts are not regular. I'm not sure whether it's in the excerpts. I just read the transcript. Oh. What? Transcript page what? 48? 48? Yes. So while they're looking for that, does it make any difference here that apparently the plane had left while his search was going on? We saw no difference at all that a terrorist could come in and be late to a plane on purpose, leave an object or test the system to see if he could get through simply because he's late. Mr. Akai showed up late and he wanted to whip right through. It was his apparent motivation. We'd say it makes no difference at all. We have to be able to stop him. Might not intend to get on the plane at all. Might be they're late. Might be they're late so he gives them an excuse to leave. But really his intention might be to just get to the gate area and do some mischief there. Exactly. And somebody else could be in there who is going to get on the plane, take a bomb or something on the plane. And at the gate area we also have to protect people there. Again, it's another place where people are pulled up. If a bomb went off there, there would be a lot of trouble. Not as much trouble as in a full airplane, but nevertheless a lot of people would be killed. So just to clarify, so your position is it's one continuous search from the minute you step into the magnometer area until you step out of the checkpoint area? Well, thank you for asking the question. Our position is it doesn't matter whether it's a new search or not. Special needs justifies the secondary search. We do think it's one continuous search. The program is administered in a uniform way. We don't, while there are different layers of going through this checkpoint, it's different than, as some judges have suggested, getting further information and picking up somebody as they're in the boarding area they're about to get on the plane. We certainly treat those as different things. Here, there's a checkpoint search, and it has different layers that we think are appropriate to screening terrorists and, in particular, deterring terrorists. I'm sorry. Let me ask you this. I found what you did. It is here. It's page 50 in terms of the exceptional record, but I found it was in the transcript. I think I hear your argument being that, well, once we have somebody in secondary search, our interest in safety is not exhausted by finding the things that would trigger the beep from the wand. It may very well be that there are hard objects that we now know are in the pocket that do not trigger the wand that may nonetheless be a knife, just not made out of metal, so that I think your argument is that once we're in that position in the middle of the secondary search, when he's finally pulled the keys out of his pocket after denying that he had anything metal in the pocket, but the officer realized, the TSA officer realizes that there's something still in his pocket that's hard, that that still is a search connected with safety within the airport. That's the argument? Well, we would append the deterrence rationale that we push that we think if you could say, just, no, I don't want to do it at this point, when you realize you're going to be secondarily searched, we would be asking terrorists to test their luck in this way. So that is the argument, but we also believe that there's a strong deterrence rationale here. Counsel, am I correct that so long as it stays a special needs search, you can only look for things that are going to be dangerous on airplanes? You can't look at all the long-haired kids with backpacks for marijuana? We're only looking for guns, weapons. Let's face it, there's explosives that we're worried about. If you turn it into a Terry stop, then it could be broader, but. Oh, it certainly could be broader, but, you know, if we see marijuana, you know, we do just what I would do in the situation. I'd call the cops. I'm not saying if you see it. I'm saying can you look for it? Oh, we can't. We don't. We're looking for weapons. That's all we're concerned about, weapons, explosive devices and incendiary matters, things that could, in the worst of the trend, take down an airplane. Well, if you look at the transcript, page 48, which is what you were directing, I say. Yes, Your Honor. The guy says, I found this object, and he calls the policeman over because he says, I want you to be present when I unwrap it. Yes, Your Honor. I don't quite get that. What was the point of that? Well, I think he was frightened. My reading of the transcript is he thought this might be a knife, and he was worried that he'd get stabbed. He doesn't say, I thought it might be a knife. Well, he does say that. It sounds to me a lot more like he thought it might be drugs, and he thought he better call the policeman over to help the policeman apprehend this guy who's committing a crime. Well, he says he didn't know what it was, and certainly a knife is part of what he said. It is possible that that's. . . A pipe-shaped knife? Well, we don't know. It was wrapped in a napkin, I believe, or maybe some sort of paper, tissue paper. We don't know what was in there. He just didn't know. He was. . . Counsel, you have Easter time. Very briefly. Thank you, Your Honor. I just wanted to point out something that, at least with respect to the facts of my case and deterring terrorists and stopping them from probing the workings of an airport, is that a person who wanted to succeed in disabling an airplane or getting on an airplane with a bomb does not fly without identification and thereby submit himself to a secondary search. The other thing is that the TSA's website states that a person may, at any point in the screening process, withdraw his consent to be searched. At any point in the screening process. What's that in the excerpts? That's not in the excerpts, Your Honor. That's at the TSA website. Let me get you the site. And, in fact. . . Is that part of the regulations or just the website information? That's the website information. I suspect that it comes from regulations. However, I believe the regulations are secret and we're not allowed to see them. I suspect that some of you folks might have seen them during the Gilmore v. Gonzales case. What I'm trying to point out is that you have consent, and does it have anything to do with the expectation of privacy under these facts? When you tell an entire nation, an entire world, that you may not, that you may leave at any point during the screening process. When you tell people that if they have religious and cultural needs, that's another part of the TSA website, that you may elect to be searched in a different way or not.  I'm sorry. That they can't have their shoes searched, that's public notice. So that's expectations. Thank you. The case just argued is submitted for decision. And that concludes the Court's calendar for this session. Thank you. Oh, wow.
judges: Schroeder, Kozinski, Kleinfeld, Hawkins, Silverman, Graber, McKeown, Wardlaw, W Fletcher, Gould, Rawlinson, Bybee, Callahan, Bea, Ikuta